# EXHIBIT B

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**TYLER DIVISION**

| | | |
|---|---|---|
| **REALTIME DATA, LLC,** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | **CIVIL ACTION NO. 6:16-CV-00088** |
| | § | **RWS-JDL** |
| | § | |
| | § | **LEAD CASE** |
| **v.** | § | |
| | § | **JURY TRIAL DEMANDED** |
| **ORACLE AMERICA, INC.,** | § | |
| | § | |
| | § | |
| *Defendant.* | § | |

<u>**REDACTED MEMORANDUM OPINION AND ORDER**</u>

Before the Court is Defendant Oracle America, Inc.'s ("Oracle") Motion to Exclude the Testimony and Opinions of Plaintiff's Expert Arthur Keller.  (Doc. No. 106.)  Plaintiff Realtime Data, LLC ("Realtime") has filed a Response.  (Doc. No. 118.)

Also before the Court is Oracle's Motion for Sanctions and to Exclude Expert Arthur Keller for Failure to Comply with Fed. R. Civ. P. 26 and 30.  (Doc. No. 108.)  Realtime has filed a Response (Doc. No. 113), Oracle has filed a Reply (Doc. No. 125), and Realtime has filed a Sur-Reply (Doc. No. 127).

For the reasons stated herein, the Court **GRANTS-IN-PART** and **DENIES-IN-PART** Oracle's Motions.  (Doc. Nos. 106, 108.)

I.      **BACKGROUND**

Realtime alleges that Oracle infringes certain claims of U.S. Patent No. 7,415,530 ("the '530 Patent"), U.S. Patent No. 9,116,908 ("the '908 Patent"), U.S. Patent No. 8,643,513 ("the '513 Patent"), U.S. Patent No. 9,054,728 ("the '728 Patent"), and U.S. Patent No. 6,597,812

("the '812 Patent").  The Asserted Patents generally relate to different systems and methods of data compression.  The Asserted Claims of each of the Asserted Patents each require a combination of two compression methods.  Thus, a single form of compression standing alone would not infringe the Asserted Claims.

Realtime alleges that Oracle's SecureFiles, ZFS, and Database In-Memory ("DBIM") products infringe the Asserted Claims of the Asserted Patents.  Specifically, Realtime asserts that the SecureFiles and ZFS products infringe the Asserted Claims of the '513, '728, '530, and '908 Patents because, among other things, each of these software products is capable of compressing data using a combination of compression and deduplication.[1]  Realtime asserts that the DBIM product infringes the Asserted Claims of the '812 Patent because it is capable, among other things, of compressing data using a combination of dictionary compression and run-length encoding.

Realtime has designated Dr. Arthur Keller as a Technical Expert in this matter. Specifically, Dr. Keller was asked "to perform an analysis of the technical features of the 'Accused Products,' particularly the key features as stated by Defendant, and approximate or estimate the portion of the Accused Products attributable to the patented technology as compared to those features with no relation to the patented technology."  (Doc. No. 106, Ex. 1 ("Keller Rep."), ¶1.)  Dr. Keller holds a Ph.D. in computer science and is currently a lecturer and research associate at the University of California, Santa Cruz.  (*Id.* at ¶¶4, 7, Ex. B.)  Dr. Keller also holds a number of additional degrees in mathematics and computer science.  (*Id.*)  According to Realtime, Dr. Keller "has forty years of education and experience with hardware and software design and development, with a particular emphasis on database products, like the infringing

---

[1] Oracle disputes that deduplication is a compression technique or "encoder" as required by the '513, '728, '530, and '908 Patents.  However, for purposes of this Motion only, the Court will assume that deduplication is a compression technique as required by the Asserted Claims.

products." (Doc. No. 118, at 2.) Beyond his academic experience, Realtime states that Dr. Keller has served as Chief Data Scientist and/or Chief Technology Officer for a number of software companies. (Keller Rep., ¶¶8, 21, Ex. B.) According to Realtime, through this role and other roles, Dr. Keller "interacted with customers and studied the impact of features and design on customer demand and pricing." (Doc. No. 118, at 3.)

Dr. Keller uses a four-part apportionment methodology to determine what portion of the smallest salable unit of the Accused Products is attributable to the patented features. (*See generally*, Keller Rep.) Specifically, according to Realtime, Dr. Keller 1) identified the "relevant and most salient Oracle materials and witness testimony to study regarding the various product features Oracle touts and discusses"; 2) selected "various key features" in the products, allegedly based on Oracle's statements to customers in marketing materials and other materials; 3) grouped the features into "patented" features and features unrelated to the patent "relying on his own technical expertise"; and 4) used "various reasoning, documents, testimony, and his expert judgement—all tied to Oracle and database-industry facts—to assign a different weight to the patented features." (Doc. No. 118, at 3-4.)

In performing step four of his methodology, Dr. Keller begins by counting up his total number of identified "key features" for each of the Asserted Products and dividing this value into the total number of "patented features." (Doc. No. 106, at 5; Doc. No. 118, at 4; *see also* Keller Rep., ¶¶49-50; 69-71; 73.) According to Realtime, Dr. Keller then adjusted this "starting-point apportionment" "based on Oracle's documents and his decades of experience with database products." (Doc. No. 118, at 4; Keller Rep. ¶¶ 50-59; 73-76.) For instance, Dr. Keller asserts that SecureFiles includes five original features. (Keller Rep., ¶19.) Dr. Keller further asserts that compression and deduplication represent two of these five original features. (*Id.*) Based on this,

Dr. Keller divides two by five to reach a 40% apportionment factor, which he then adjusts upward to 50% based on various pieces of evidence in the record to reach a final apportionment range of 40-50%.  (*Id.* at ¶¶49-58.)  Likewise, Dr. Keller asserts that ZFS has seventeen relevant features, two of which are the accused compression and deduplication features.  (*Id.* at ¶73.)  Dr. Keller divides two by seventeen to reach a 12% apportionment factor, which he then adjusts upward to reach a final apportionment range of 12-24%.  (*Id.* at ¶¶73-76.)  With respect to DBIM, Dr. Keller asserts that DBIM's value is mainly driven by speed, which in turn is driven by two relevant features: (1) its "in-memory nature" and (2) the "accused compression features." (*Id.* at ¶¶68-69.)  Dr. Keller then splits the value between these two features to reach a final apportionment factor of 50%.  (*Id.* at ¶71.)  Mr. Mills, Realtime's damages expert, uses these values to apportion the royalty base.  (*See* Doc. No. 121, at 13 (Realtime's Response to Oracle's Motion to Exclude the Testimony and Opinions of Mr. Mills).)  Mr. Mills testified that he has no independent opinions regarding the appropriate apportionment factors.  (Doc. No. 107, Ex. 2 ("Mills Dep."), at 124:7-16.)

Oracle proceeded to depose Dr. Keller regarding his expert opinions and methodology on January 13, 2017.  (*See generally*, Doc. No. 108, Ex. 2 ("Tr.").)  During the deposition, Oracle asked a number of "yes or no" questions about the basis for Dr. Keller's methodology, including:

- "As you sit here right now, can you identify a single peer-reviewed journal that applied the same apportionment methodology that you applied in this case, 'yes' or 'no'?" (Tr. at 65:22-25; *see also* Tr. at 58:13-77:20.)

- "Did you do any specific investigation to corroborate Mr. Jernigan's testimony that there were five original ACO features, 'yes' or 'no'?" (Tr. at 92:12-14; *see also* 91:16-93:18.)

4

- "Did you ever conduct an analysis to determine how Oracle defines features in ACO, yes or no?"  (Tr. at 99:12-14; *see also* Tr. at 98:14-102:21.)

- "[Y]ou didn't try to calculate an incremental value that SecureFiles has over Basic files, right?"  (Tr. at 161:4-6; *see also* Tr. at 160:16-163:12.)

- "'Yes' or 'no,' did you attempt to generate a list of all possible DBIM features?"  (Tr. at 169:19-20; *see also* Tr. at 169:8-172:14.)

- "[Y]our list of 17 features are only software features, correct?"  (Tr. at 225:17-18; *see also* Tr. at 225:17-227:12.)

- "'Yes' or 'no,' did you conduct any analysis of consumer demand for any particular kind of data compression technology in connection with your report?"  (Tr. at 261:8-11; *see also* Tr. at 259:13-263:15; 264:22-266:5.)

- ████████████████████████████████████████████████████████████
  ██████████████████████████████████████

- "'Yes' or 'no,' would it change your opinion if you were to learn that Oracle licenses Solaris and ZFS at no charge?"  (Tr. at 222:7-9; *see also* Tr. at 222:7-225:4.)

- ████████████████████████████████████████████████████████████
  ███████████████████████████  ████████████████████████
  ██████████████

In each of these instances, Dr. Keller failed to provide a "yes" or "no" answer to counsel's questions.  Oracle also posited a number of hypothetical questions relating back to Dr. Keller's opinions, including:

- Questions relating to whether a single hypothetical encoder is ever capable of performing better than a combination of two hypothetical encoders.  (Tr. at

34:1842:8;  *see, e.g.* Tr. 35:12-14 ("Can you think of a case where a single compression encoder would have a comparable benefit to using two compression encoders?").)

- Questions relating to whether it is possible to have a dual format database that is not an in-memory database.  (Tr. at 174:19-179:5; *see also* Tr. at 184:17-185:6.)

- Questions relating to whether considering compression and deduplication as a single feature rather than two separate features of the SecureFiles product would change Dr. Keller's ultimate ratio under his methodology.  (Tr. at 81:3-82:15; *see also* Tr. at 109:4-110:13; 117:4-17; 120:17-121:4.)

- Questions relating to whether Dr. Keller's ultimate ratio would be higher if the patents covered more than two key features of the SecureFiles products.  (Tr. 82:17-87:8.)

- Questions relating to whether Dr. Keller's methodology would include dividing a particular number of "patented" features by the total number of features if Dr. Keller used a different number of starting features as indicated by various Oracle documents or other hypotheticals.  (Tr. at 109:4-110:13; 117:4-17; 120:17-121:4; 186:9-189:3; 198:10-22.)

In each of these instances, Dr. Keller asserted that he could not answer the question because, for example, it was based on an incomplete hypothetical.

## II.     LEGAL STANDARD

### 1.     Federal Rule of Evidence 702

Rule 702 provides that an expert witness may offer opinion testimony if (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the

evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.  FED.R.EVID. 702.

The Rules also "assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharms. Inc.*, 509 U.S. 579, 594, 597 (1993).

"The relevance prong [of *Daubert*] requires the proponent [of the expert testimony] to demonstrate that the expert's 'reasoning or methodology can be properly applied to the facts in issue.'" *Johnson v. Arkema, Inc.*, 685 F.3d 452, 459 (5th Cir. 2012) (quoting *Curtis v. M & S Petroleum, Inc.*, 174 F.3d 661, 668 (5th Cir. 1999)).  "The reliability prong [of *Daubert*] mandates that expert opinion 'be grounded in the methods and procedures of science and . . . be more than unsupported speculation or subjective belief.'" *Johnson*, 685 F.3d at 459 (quoting *Curtis*, 174 F.3d at 668).

In assessing the "reliability" of an expert's opinion, the trial court may consider a list of factors including: "whether a theory or technique . . . can be (and has been) tested," "whether the theory or technique has been subjected to peer review and publication," "the known or potential rate of error," "the existence and maintenance of standards," and "general acceptance" of a theory in the "relevant scientific community." *Daubert*, 509 U.S. at 593–94; *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150 (1999) ("*Daubert* makes clear that the factors it mentions do *not* constitute a 'definitive checklist or test.'"); *U.S. v. Valencia*, 600 F.3d 389, 424 (5th Cir. 2010).  "The proponent need not prove to the judge that the expert's testimony is correct, but she must prove by a preponderance of the evidence that the testimony is reliable." *Johnson*, 685 F.3d at 459 (quoting *Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 276 (5th Cir.

1998) (en banc)).   At base, "the question of whether the expert is credible or the opinion is correct is generally a question for the fact finder, not the court."   *Summit 6, LLC v. Samsung Elecs. Co., Ltd.*, 802 F.3d 1283, 1296 (Fed. Cir. 2015).

### 2.      Apportionment

In a reasonable royalty analysis, damages must be tied "to the claimed invention's footprint in the marketplace."   *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 869 (Fed. Cir. 2010).   Thus, "where multi-component products are involved, the governing rule is that the ultimate combination of royalty base and royalty rate must reflect the value attributable to the infringing features of the product, and no more."   *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014) (citing *VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1326 (Fed. Cir. 2014)).   When the accused products have both patented and non-patented features, the damages analysis requires an apportionment analysis in order to determine the value added by such features.   *Id.*

## III.    DISCUSSION

Oracle seeks to exclude Dr. Keller's opinions and testimony on a number of grounds. Specifically, Oracle argues that 1) Dr. Keller is not qualified to serve as an expert in assessing apportionment with respect to the Accused Products; 2) Dr. Keller failed to exclude the value of non-patented features of the Accused Products; 3) Dr. Keller's methodology is arbitrary, subjective, and not based on any accepted scientific method; and 4) Dr. Keller did not answer relevant questions about the methodology and opinions in his expert report during his deposition. (Doc. No. 106, at 1; Doc. No. 108, at 1.)

Realtime responds that 1) Dr. Keller is more than qualified as a technical expert to provide a technical apportionment analysis of the Accused Products; 2) Dr. Keller used a sound

methodology that properly omitted the value of non-patented features of the Accused Products; 3) Dr. Keller's methodology has been "accepted by numerous courts"; and 4) Dr. Keller provided full and complete responses to Oracle's questions during his deposition.  (Doc. No. 118, at 1; Doc. No. 113, at 1.)

### 1.  Dr. Keller's Qualifications

Oracle argues that Dr. Keller's Ph.D. in computer science "does not qualify him to serve as an expert in apportionment of customer demand for, or economic value of, the accused features as a fraction of the total revenues derived from Oracle's sales of the accused software products."  (Doc. No. 106, at 6.)  Oracle argues that because Dr. Keller has no experience in economics or econometrics, and has no prior experience conducting an apportionment analysis, his report and testimony should be excluded in their entirety.  (*Id.*)  Realtime argues that an apportionment analysis "is actually technical in nature as it focuses on technical product features."  (Doc. No. 118, at 6.)  Realtime argues that Dr. Keller's qualifications "exceed any threshold" qualification requirement with respect to both his technical background and his financial and marketing experience.  (*Id.* at 6-7.)  With respect to Dr. Keller's economic qualifications, Realtime argues that Dr. Keller was a Founder and Chief Financial Officer for two companies.  (*Id.* at 7; citing Keller Rep., ¶¶15, 21, 23, Ex. B.)  Realtime argues that "[i]n these roles, he interacted with customers and studied the impact of features and design on customer demand and pricing."  (*Id.*)

An apportionment analysis is performed as part of a damages calculation.  *Ericsson*, 773 F.3d at 1226.  As such, there is an inherently economic quality to an apportionment analysis: parties are attempting to "apportion the ***defendant's profits and the patentee's damages*** between

the patented features and the unpatented features." *Garretson v. Clark*, 111U.S. 120, 121 (1884) (emphasis added).

Typically, certain technical inputs are relevant to the apportionment analysis. In order to ultimately determine the economic value attributable to the patented invention, it is helpful to understand the technical aspects of an accused product and how they interact with one another. Dr. Keller, with his Ph.D. in computer science and academic and industry experience in hardware and software design and development, is qualified to review the technical information in this case and opine regarding the importance of the various features of the accused products from a technical perspective. However, due to Dr. Keller's limited experience with economic apportionment, he is not qualified to provide an ultimate opinion with respect to a damages value attributable to the patented invention. In other words, Dr. Keller's opinions about the technical value of the accused products—and specifically opinions about the incremental benefit conferred by the patented features of the accused products on the technology—may be an input into the damages expert's opinion about the proper apportionment value, but may not be the final apportionment value itself. In turn, this means Mr. Mills cannot simply rely on the technical value Dr. Keller ascribes to the infringing features of the accused products in determining a proper apportionment value.

## 2.    Dr. Keller's Methodology

Oracle argues that Dr. Keller improperly includes the value of non-infringing technology in his apportionment analysis. (Doc. No. 106, at 7.) Oracle notes that each of the Asserted Patents requires some combination of two forms of compression. (*Id.* at 8.) Thus, a system that has a single form of compression would not infringe the patents. (*Id.*) Oracle argues, however, that "Dr. Keller expressly includes the value of compression and deduplication standing alone

10

because he counts each one as a separate patented 'feature.'" (*Id.*) Oracle argues that Dr. Keller does not attempt to value the patents' incremental improvement (*i.e.*, the combination of two compression techniques) separate from the value of the compression techniques individually. (*Id.*) In response, Realtime argues that the apportionment analysis is measured "*by the elements of the asserted claims*." (Doc. No. 118, at 7 (emphasis in original) (citing *Astrazeneca AB v. Apotex Corp.*, 782 F.3d 1324, 1337-38 (Fed. Cir. 2015)).)

Oracle separately challenges Dr. Keller's methodology on a number of other grounds, arguing: 1) there is no academic support for Dr. Keller's analysis (Doc. No. 106, at 10); 2) Dr. Keller provided no reliable explanation for how he defined a "feature" and why he assigned his features equal weight (*id.* at 10-12); 3) Dr. Keller failed to investigate how features are defined in the market and how particular features might influence consumer demand (*id.* at 12-14). Realtime responds that 1) lack of peer-reviewed or published journal support for Dr. Keller's opinions should go to their weight, not admissibility, but in any event Dr. Keller did refer to a written report during his deposition and courts have approved of comparable methodologies (Doc. No. 118, at 9-1); 2) Dr. Keller relied on Realtime's infringement contentions as well as Oracle's usage of the term "feature" to define particular features and ultimately did not assign the features equal weight (*id.* at 12-13); 3) Dr. Keller properly relied on Oracle testimony and marketing documents, and his selection of certain documents does not go to the admissibility of his opinions (*id.* at 14-15).

As an initial matter, Realtime's understanding of how to calculate apportionment damages is legally flawed. Realtime argues that an apportionment analysis is measured "by the elements of the asserted claims" and as such, Dr. Keller properly attributed the full value of SecureFiles' compression feature (as one claim element) and the separate, full value of

SecureFiles' deduplication feature (as a second claim element) to the patented claims. (Doc. No. 118, at 8.) In other words, Realtime asserts that damages need not be "limited to the intersection of all claimed elements[,] or the point of novelty." (*Id.*) However, Realtime's cited cases do not support this conclusion. Indeed, Realtime's cases support the conclusion that a damages analysis must take into account the incremental benefit conferred by the non-conventional elements of a patent claim **taken as a whole**. *Astrazeneca*, 782 F.3d at 1339; *University of Pittsburgh of Commonwealth v. Varian medical Sys., Inc.*, 561 Fed.Appx. 934, 947-50 (Fed. Cir. 2014); *see also Ericsson*, 773 F.3d at 1226; *ResQNet.com*, 594 F.3d at 869. For instance, in *Astrazeneca* the Federal Circuit found that in evaluating the value of a claimed novel combination of otherwise old or conventional elements, "the question is how much new value is created by the novel combination, **beyond the value conferred by the conventional elements alone**." *Astrazeneca*, 782 F.3d at 1339 (emphasis added). In *University of Pittsburgh*, the Federal Circuit found that the patent claim at issue comprised a beam generator incorporated into a linear accelerator. 561 Fed.Appx. at 947-50. The Federal Circuit noted that "[Defendant] itself has acknowledged the value added by the function of the **combined** apparatus." (*Id.*) (emphasis added). *University of Pittsburgh* emphasized that certain *Georgia-Pacific* factors additionally guarded against compensation for more than the added value attributable to the invention. (*Id.*) In other words, contrary to Realtime's assertion, the intersection of the claim elements, *i.e.* the "incremental benefit" created by the invention, dictates the appropriate damages ultimately associated with a patent claim. (*See* Doc. No. 118, at 8.)

With the appropriate legal standard in mind, Dr. Keller's "starting-point apportionment," in which Dr. Keller divides the number of patented "features" of an accused product by an overall number of identified features in the product, fails to pass muster under Rule 702. Such a

calculation fails to adequately account for the benefit of the ***combination*** of the two compression elements of the accused products as they relate to the patent claims.[2]   Under Dr. Keller's approach, the "starting-point apportionment" value attributed to the claimed invention is effectively inflated to also include unclaimed features of the accused products, for example, the use of a single form of compression standing alone.  The fact that Dr. Keller ultimately adjusts his "starting-point apportionment" value upward with respect to ZFS and SecureFiles does not resolve this issue.  Likewise, Realtime cannot simply point to Mr. Mills' *Georgia-Pacific* analysis and argue that any shortcomings with Dr. Keller's apportionment methodology can be resolved there.

Oracle will be able to challenge Dr. Keller's understanding of the term "feature" and Dr. Keller's reliance on various documents to identify relevant features of the accused products during cross-examination at trial.  Likewise, Oracle will be able to otherwise cross-examine Dr. Keller regarding what criteria did or did not influence Dr. Keller's opinions.  As stated above, however, the ultimate apportionment value for the accused products must rest with Realtime's damages expert, whom Oracle will also be able to cross-examine regarding his opinions.

### 3.     Oracle's Deposition of Dr. Keller

Oracle also moves for sanctions and to exclude the opinions and testimony of Dr. Keller under Rule 37.  (*See* Doc. No. 108.)  Oracle argues that Dr. Keller's obstructionist behavior during his deposition "denied Oracle a fair opportunity to gather the evidence needed to challenge and refute Realtime's damages claims."  (*Id.* at 1.)  Oracle argues that Dr. Keller

---

[2] Dr. Keller also fails to adequately explain why each of his identified "features" should be entitled to equal weight for his initial "starting-point apportionment" analysis.  The fact that he first calculates a simple ratio with this assumption and then makes adjustments based on his review of the evidence is questionable.  Indeed, Dr. Keller does not even make such an adjustment with respect to DBIM.  However, given that the Court finds it appropriate to strike Dr. Keller's "starting-point apportionment" analysis altogether, the equal weighing of features in that analysis is no longer an issue.

would answer simple questions concerning the bases for his opinions with "non-responsive, evasive, and rambling answers rather than provide a fair response." (*Id.*)  Oracle argues that the prejudice towards it would not be cured by a second deposition because "there is no indication that [Dr. Keller] would be more forthcoming in a second deposition." (*Id.* at 8.)

Realtime argues that Dr. Keller "conducted himself professionally and respectfully throughout his entire 7+ hour deposition, and responded to each of Defendant's questions." (Doc. No. 113, at 5.)  Realtime argues that Oracle "cherry picks" examples and mischaracterizes Dr. Keller's testimony to support its Motion. (*Id.* at 5, 7.)  Realtime then responds to some of Oracle's identified portions of testimony to assert that Dr. Keller did indeed answer Oracle's questions. (*See id.* at 6-8.)  Realtime asserts that there is no prejudice to Oracle, and even if Dr. Keller did commit a discovery violation, "there is no dispute that the full factual, theoretical, and legal bases for Dr. Keller's opinions are disclosed in his written report." (*Id.* at 8-9.)

Oracle's complaints regarding Dr. Keller's testimony relate to two types of questions: (1) "yes" or "no" questions that Dr. Keller did not answer with a "yes," "no," or "I don't know"; and (2) hypothetical questions relating to data compression generally or Dr. Keller's methodology that Dr. Keller refused to answer as "incomplete hypotheticals."

With respect to the first category of questions, although Dr. Keller did not flatly refuse to answer Oracle's questions, his responses were primarily evasive.  For example, in one line of questioning regarding whether Dr. Keller conducted any analysis of consumer demand for data compression technology, Dr. Keller consistently failed to provide responsive answers to Oracle's questions:

> Q:       "Yes" or "no," did you conduct any analysis of consumer demand for any particular kind of data compression technology in connection with your report?

A:      So the analysis that I did was an analysis of the technical – a technical analysis of the features and determining which features are associated with the asserted patent claims and which features were not associated with the asserted patent claims and to do an evaluation of the comparing the features associated with the patent claims with those not associated with the patent claims.

And in terms of that, I didn't look at any particular customer and why any particular customer might want any feature or aspect of these products.

Q:      "Yes" or "no," did you undertake any market surveys in connection with your work on this report?

A:      As I said, my analysis was a technical analysis and the technical analysis was based on the product features.

And I understand that my analysis was used for the – for the damages expert.  That's what I was doing here.

So my analysis was a technical comparison of the various patent – the various features as they relate to the patent claims.

Q:      "Yes" or "no," did you interview any focus groups in connection with your work on this report?

A:      So once again, I indicate what I did, which is to do a technical analysis of the patent – of the accused instrumentalities and look at the features of those patent – of the features of those systems and to separate those into the features that were implicated by the patent claims and those that were not.

This is the same kind of analysis that was done by Dr. Hitt, for example, with the Forester report and in that analysis, it has the same four-step process that I went through.

Q:      "Yes" or "no," did you conduct any independent market research into the demand for the accused products?

A:      The analysis that I did is comparable to Dr. Hitt's analysis with respect to the Forester report and the four-step process there and that those four steps involved identifying a set of documents, identifying a set of features for each system, determining which features are implicated by the patent claims – the asserted patent claims and which ones are not and then evaluating that difference between those features associated with the patent claims and those not associated with the patent claims and it's comparable to the analysis that Dr. Hitt did with respect to using the Forester report.

(Tr. at 261:8-263:15.)

These are simple questions relating to the basis for Dr. Keller's opinions.  However, although apparent from Dr. Keller's (lack of) response that he did not perform market research or interview focus groups, Dr. Keller repeatedly provides variations on the same boilerplate, nonresponsive answer stating that he performed a "technical analysis."  There is no reason that Dr. Keller should be evasively answering these basic questions about his methodology.  The fact

15

that in some instances during his deposition, Dr. Keller would provide some language within his answer directly addressing counsel's question does not solve this problem.  Such a tactic is prejudicial to Oracle because it prevents a meaningful cross-examination of the basis of Dr. Keller's opinions.

With respect to the second category of questions—hypothetical questions—Dr. Keller provided sufficient answers to Oracle's inquiries.  Dr. Keller is entitled to challenge the basis for the hypothetical question or otherwise explain why he cannot provide a full and complete answer with respect to a hypothetical scenario.  These questions do not relate to the same basic inquiries about Dr. Keller's methodology as many of the "yes" or "no" questions that Dr. Keller evasively answered.

## IV.     CONCLUSION

For the reasons stated herein, the Court **GRANTS-IN-PART** and **DENIES-IN-PART** Defendant's Motion to Exclude the Testimony and Opinions of Plaintiff's Expert Arthur Keller (Doc. No. 106) and Defendant's Motion for Sanctions and to Exclude Expert Arthur Keller for Failure to Comply with Fed. R. Civ. P. 26 and 30 (Doc. No. 108).

The Court **STRIKES** the portions of Dr. Keller's report relating to his initial apportionment of patented versus non-patented features of the accused products.  The Court further **STRIKES** Dr. Keller's opinions relating to an ultimate apportionment value of the accused products with respect to the Asserted Patents.  To the extent Dr. Keller deems it necessary to attribute a specific, numerical value to the patented aspect of each accused product, that value may only be related to a technical evaluation of the accused products rather than an ultimate apportionment opinion.  It is further **ORDERED** that Plaintiff has ten (10) days from

the date of this Order to serve Defendant with a Supplemental Expert Report from Dr. Keller addressing the deficiencies discussed above.

The Court further **ORDERS** Dr. Keller to appear for an additional deposition regarding his expert opinions **before April 17, 2017**.  The deposition is not to exceed one and a half (1.5) hours, with a maximum of one (1) hour directed toward the opinions in Dr. Keller's forthcoming Supplemental Expert Report and a maximum of thirty (30) minutes directed towards the "yes or no" questions Dr. Keller failed to answer at his previous deposition and that remain relevant to his expert opinions.  The parties are directed to call the Court if Dr. Keller again fails to provide responsive answers to Oracle's questions during deposition.  Plaintiff shall pay Defendant's fees and costs for this deposition.

If, after Oracle receives Dr. Keller's supplemental report and has had the opportunity to depose him, Oracle still seeks to bring a *Daubert* challenge with respect to this testimony, the deadline to file such a motion is April 17, 2017.  Realtime will have seven (7) days from the filing of such a motion to file a Response.

**So ORDERED and SIGNED this 22nd day of March, 2017.**

JOHN D. LOVE
UNITED STATES MAGISTRATE JUDGE

17