**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | |
|---|---|
| JOE ANDREW SALAZAR,<br><br>  Plaintiff,<br><br>v.<br><br>HTC CORPORATION,<br><br>  Defendant. | Civil Action No. 2:16-cv-01096-JRG-RSP<br><br>JURY TRIAL DEMANDED<br>**PATENT CASE** |

**HTC CORPORATION'S *DAUBERT* MOTION TO EXCLUDE THE OPINIONS AND
TESTIMONY OF PLAINTIFF'S DAMAGES EXPERT, JUSTIN BLOK**

Jerry R. Selinger
State Bar No. 18008250
Email: jselinger@pattersonsheridan.com
Trampas A. Kurth
State Bar No. 24055807
Email: tkurth@pattersonsheridan.com
PATTERSON + SHERIDAN, LLP
1700 Pacific Avenue, Suite 2650
Dallas, Texas 75201
Tel: 214.272.0957
Fax: 713.623.4846

Harry Lee Gillam, Jr.
State Bar No. 07921800
Email: gil@gillamsmithlaw.com
GILLAM & SMITH, LLP
303 South Washington Avenue
Marshall, Texas 75670
Tel: 903.934.8450
Fax: 903.934.9257

Fred I. Williams
State Bar No. 00794855
Email: fwilliams@velaw.com
Mario A. Apreotesi
State Bar No. 24080772
Email: mapreotesi@velaw.com
VINSON & ELKINS LLP
2801 Via Fortuna, Suite 100
Austin, Texas 78746
Tel: 512.542.8400
Fax: 512.542.8612

Todd E. Landis
State Bar No. 24030226
Email: tlandis@velaw.com
VINSON & ELKINS, LLP
2001 Ross Avenue, Suite 3700
Dallas, Texas 75201
Tel: 210.220.7700
Fax: 210.220.7716

ATTORNEYS FOR DEFENDANT
HTC CORPORATION

**TABLE OF CONTENTS**

I.   INTRODUCTION ................................................................................................................. 1

II.  LEGAL STANDARDS ........................................................................................................ 4

III. ARGUMENT ........................................................................................................................ 6

   A. Mr. Blok Did Not Properly Apportion The Value Of The "Accused IR Functionality" In The Proxy Pronto|Peel Device. ................................................................................. 6

   B. Mr. Blok Failed To Support His Underlying Premise That The Pronto|Peel Device Is A Proper Proxy For The Value Of "IR Functionality" In The Accused Instrumentalities. ......... 9

   C. Mr. Blok's 50-50 Profit Split Is Unreliable. ................................................................... 11

   D. Other Opinions And Testimony The Court Should Exclude ......................................... 12

      1. The Court should exclude opinions and testimony taken from interviews with Mr. Griffin that are not in Mr. Griffin's expert report. .................................................. 12

      2. Mr. Blok's irrelevant opinions and testimony that would taint the jury should be excluded. ................................................................................................................ 13

IV. CONCLUSON ..................................................................................................................... 14

# **TABLE OF AUTHORITIES**

**Cases**

*Daubert v. Merrell Dow Pharmaceuticals*,
    509 U.S. 579 (1993) ............................................................................................... 1, 3-4

*Ericsson, Inc. v. D-Link Sys., Inc.*,
    773 F.3d 1201 (Fed. Cir. 2014) ............................................................................... 4-5, 9

*Finjan Inc. v. Blue Coat Svcs.*,
    2018 U.S. App. LEXIS 601 (Fed. Cir. January 10, 2018) ......................................... 5, 10

*Garretson v. Clark*,
    111 U.S. 120, 121 (1884) ........................................................................................... 1, 5

*General Elec. Co. v. Joiner*,
    522 U.S. 136 (1997) ..................................................................................................... 4

*Knight v. Kirby Inland Marine Inc.*,
    482 F.3d 347 (5th Cir. 2007) ....................................................................................... 4

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
    694 F.3d 52 (Fed. Cir. 2012) .......................................................................... 5, 7, 9, 14

*Lucent Techs., Inc. v. Gateway, Inc.*,
    580 F.3d 1301 (Fed. Cir. 2009) ................................................................................... 4

*Mathis v. Exxon Corp.*,
    302 F.3d 448 (5th Cir. 2002) ....................................................................................... 4

*ResQNet.com, Inc. v. Lansa, Inc.*,
    594 F.3d 860 (Fed. Cir. 2010) ..................................................................................... 4

*Uniloc USA, Inc. v. Microsoft Corp.*,
    632 F.3d 1292 (Fed. Cir. 2011) ................................................................................. 14

*VirnetX, Inc. v. Cisco Sys., Inc.*,
    767 F.3d 1308 (Fed. Cir. 2014) ................................................................... 1, 4-5, 9, 12

**Statutes**

Federal Rule of Evidence 702 ........................................................................................ 1, 3-4, 11

35 U.S.C. § 284 .............................................................................................................................14

I.      **INTRODUCTION**

HTC Corporation ("HTC Corp.") moves to strike and exclude the reasonable royalty opinions of Salazar's damages expert, Justin R. Blok, under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993). Mr. Blok's opinions on what constitutes a reasonable royalty lack a reliable foundation and do not reliably apply fundamental principles of damages law in patent cases.

Salazar asserts that four HTC-branded smartphones ("Accused Instrumentalities") infringe claims of U.S. Patent No. 5,802,467 (the "'467 Patent"). Each claim includes an infrared ("IR") transceiver that, in conjunction with certain software applications, allows a user to remotely control external devices, such as televisions, from one of the Accused Instrumentalities. Because the Accused Instrumentalities admittedly include many non-patented features, Salazar's damages expert was required to "apportion the defendant's profits and the patentee's damages between the patented feature and the unpatented features" using "reliable and tangible" evidence. *Garretson v. Clark*, 111 U.S. 120, 121 (1884); *see also VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1326-27 (Fed. Cir. 2014). Mr. Blok did not do this.

The Accused Instrumentalities require software applications to implement and support the accused IR technology. The HTC One M7, One M8, and One M8 for Windows included some preloaded version of HTC Corp.'s proprietary "Sense TV" application. The HTC One M9 preloaded a third-party application supplied by Peel Technologies, Inc. (the "Peel Smart Remote" application). Each of these applications included non-patented features. Contrary to applicable law, however, Mr. Blok's "apportionment" analysis did not consider, let alone account for, any of the non-patented features provided by these applications.

In an apparent effort to avoid a direct apportionment analysis, Mr. Blok based his reasonable royalty analysis on a third-party, stand-alone device – the "Pronto|Peel device" – and used that device as a proxy for what he refers to as the "Accused IR Functionality" found in the

1

Accused Instrumentalities. Mr. Blok's use of the Pronto|Peel device as a substitute for the IR technology present in the Accused Instrumentalities, however, is fatally flawed for at least three reasons.

First, the documentary evidence on which Mr. Blok relies establishes that, to use the Pronto, a user must first download the Peel Smart Remote application to the user's smartphone. It is through the Peel Smart Remote application on the smartphone that users communicate (via Bluetooth) with and control the stand-alone Pronto|Peel device, which sends IR signals to an external device. Mr. Blok acknowledges that the Pronto|Peel device works with the Peel Smart Remote application to provide "Accused IR Functionality." Indeed, the Pronto|Peel device will not send IR signals to a user's television without first being directed to do so by the Peel Smart Remote application residing on the user's smartphone. Thus, in addition to what Mr. Blok defines as the "Accused IR Functionality," the required Peel Smart Remote application provides non-patented features to Pronto|Peel device users on their smartphones. These non-patented features include an electronic program guide (or "EPG"), a channel list based on the user's cable provider and the ability to edit the list of available channels, and the ability to identify favorite programs and to set up notifications and reminders about favorite programs, among others. *See* Section III.D.1 below.

However, relying on the false premise that the Pronto|Peel device (and the required Peel Smart Remote application residing on the user's paired smartphone) offer users nothing more than the "Accused IR Functionality," Mr. Blok improperly adopts the Pronto|Peel device as the technological and economic equivalent of the "Accused IR Functionality."[1] Accordingly, Mr. Blok fails to consider or apportion for the incremental value that non-patented features included in the required Peel Smart Remote application contributes to the value of the Pronto|Peel device

---

[1] It is important to note that the Pronto|Peel device does not function without the companion Peel Smart Remote application installed on the paired smartphone.

to its users. The result is the application of an unsound methodology.

In essence, Mr. Blok improperly equates the retail price (*i.e.*, the entire market value) of the Pronto|Peel device with the value of the "Accused IR Functionality," instead of properly apportioning the Pronto|Peel device's value between patented and non-patented features triggered by the application necessarily residing on the paired smartphone. That failure to follow settled principles of apportionment renders Mr. Blok's opinions on his proposed reasonable royalty inadmissible under Fed. R. Evid. 702(c) (expert testimony must be "the product of reliable principles and methods"). For this reason alone, the Court should exclude Mr. Blok's opinions and testimony.

Second, Mr. Blok fails to support his assumption that the Pronto|Peel device is a proper surrogate for determining the "profit" that can be attributed to the inclusion of the "Accused IR Functionality" in the Accused Instrumentalities. He offers no data at all for his premise that the retail sales price of the surrogate Pronto|Peel device is a comparable or reliable measure of the value that the "Accused IR Functionality" *adds to the Accused Instrumentalities*, which is impermissible. *See* Fed. R. Evid. 702(b) (expert testimony must be "based on sufficient facts or data").

Finally, Mr. Blok's opinion that the parties to the hypothetical negotiation would have agreed to a 50-50 split of profits (which Mr. Blok improperly calculated to be $14.00 per unit, resulting in a $7.00 per unit royalty) lacks the support and analysis that the Federal Circuit requires to pass muster under Rule 702 and *Daubert*. This is yet another reason the Court should exclude Mr. Blok's opinions and testimony.

HTC Corp. respectfully submits that Mr. Blok's fundamentally flawed premises and his equally flawed methodology render his opinions and testimony inadmissible under Rule 702 and *Daubert*. In addition, there are individual opinion statements in the Blok Report that should be excluded under Rule 702 as speculative, conclusory, and unsupported by actual data or evidence.

3

## II.     LEGAL STANDARDS

Federal Rule of Evidence 702 requires that expert testimony be (1) based on sufficient facts or data, (2) the product of reliable principles and methods, and (3) the reliable application of those principles and methods to the facts of the case.  Fed. R. Evid. 702.  In *Daubert*, the Supreme Court recognized the courts' "gatekeeping role" in "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand."  509 U.S. at 579-80; *see also General Elec. Co. v. Joiner*, 522 U.S. 136, 146-47 (1997) (upholding exclusion of expert opinions where "there is simply too great an analytical gap between the data and the opinion proffered.").  An "expert's testimony must be reliable at each and every step or else it is inadmissible."  *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 355 (5th Cir. 2007).  The party offering expert testimony bears the burden of proving that it meets all of the standards for admissibility.  *See Mathis v. Exxon Corp.*, 302 F.3d 448, 459-60 (5th Cir. 2002).

In the patent context, the "reasonable royalty analysis necessarily involves an element of approximation and uncertainty."  *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1325 (Fed. Cir. 2009) (citation and internal quotation marks omitted).  That analysis, however, must be tied "to the claimed invention's footprint in the marketplace."  *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 869 (Fed. Cir. 2010).  "[W]here multi-component products are involved, the governing rule is that *the ultimate combination of royalty base and royalty rate must reflect the value attributable to the infringing features of the product, and no more*."  *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014) (citing *VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1326 (Fed. Cir. 2014)) (emphasis added).  "No matter what the form of the royalty, a patentee must take care to seek only those damages attributable to the infringing features."  *VirnetX*, 767 F.3d at 1326.  "The patentee . . . must give evidence tending to separate or apportion the [infringer]'s profits and the patentee's damages between the patented feature and the unpatented features, and such evidence must be reliable and tangible, and not conjectural or speculative . . . ."  *Garretson*

4

*v. Clark*, 111 U.S. 120, 121 (1884); *see also VirnetX*, 767 F.3d at 1326; *Finjan Inc. v. Blue Coat Svcs.*, 2018 U.S. App. LEXIS 601 at **22-23 (Fed. Cir. January 10, 2018).

When the accused products have both patented and non-patented features, the damages analysis requires an apportionment to determine the value added by such features. *Ericsson*, 773 F.3d at 1226. Whether "viewed as valuable, important, or even essential," the patented feature must be separated. *LaserDynamics*, *Inc. v. Quanta Computer, Inc.*, 694 F.3d 52, 68 (Fed. Cir. 2012). *See also Garretson*, 111 U.S at 121.

In *Finjan*, for example, the Federal Circuit flatly rejected a reasonable royalty analysis that used a proxy for the patented invention that included both infringing and non-infringing features. 2018 U.S. App. LEXIS 601 at **22-27. There, the district court found that the defendant's dynamic real-time rating (DRTR) system (one component of the accused WebPulse cloud-based product) performed all of the infringing functions. Finjan argued that, because DRTR was the smallest salable patent practicing unit, the reasonable royalty calculation should be based on the value that the DRTR system, as a whole, added to WebPulse. The Federal Circuit, however, noted that DRTR performed other functions that did not infringe the patent-in-suit. Accordingly, the Federal Circuit held the apportionment process could not properly end with DRTR. *Id.* at **24-27.

> Because DRTR is itself a multi-component software engine that includes non-infringing features, the percentage of web traffic handled by DRTR is not a proxy for the incremental value of the patented technology to WebPulse as a whole. Further apportionment was required to reflect the value of the patented technology compared to the value of the unpatented elements.

*Id.* at **27-28.

As demonstrated below, despite his lip-service to the governing principles of apportionment, Mr. Blok's reasonable royalty analysis does not actually apply them, let alone apply them in a reliable or admissible way.

### III. ARGUMENT

#### A. Mr. Blok Did Not Properly Apportion The Value Of The "Accused IR Functionality" In The Proxy Pronto|Peel Device.

As already noted, in his reasonable royalty analysis, Mr. Blok uses a third-party, stand-alone device – the Pronto|Peel – as a proxy for valuing what he defines as the "Accused IR Functionality." Mr. Blok describes the Pronto|Peel device:

> The "Pronto" is a device that turns smartphones into a "smart universal remote that enables you to control virtually all TVs, set-top boxes, DVD, Blu-ray and more." The Pronto *works with the Peel Smart Remote app* and adds two-way IR functionality to smartphones that lack this capability. The Peel Smart Remote app is the same app that is utilized by the Accused Products *to provide the Accused IR Functionality*. The Pronto connects to the user's smartphone via Bluetooth and connects with other devices via IR.

Blok Report, ¶ 70 (emphasis added); *see also* Blok Report, ¶116.[2] Despite acknowledging that the Pronto|Peel device "works with" the Peel Smart Remote application (installed on a paired smartphone) to provide the "Accused IR Functionality," Mr. Blok's analysis ignores the non-patented features of the companion Peel Smart Remote application. Accordingly, he did not consider whether and to what extent the non-patented features (as opposed to the "Accused IR Functionality") added incremental value to the Pronto|Peel device.

As already noted, the Peel Smart Remote application residing on a paired smartphone is essential to and supports and implements the so-called "Accused IR Functionality" in the Pronto|Peel device. But the required Peel Smart Remote application indisputably includes non-patented features in addition to basic IR remote control functionality (on/off, channel up/down, volume up/down, etc.). This is evident from materials on which Mr. Blok himself relies in his

---

[2] Relevant excerpts from the Blok Report are attached to the Declaration of Jerry R. Selinger ("Selinger Decl.") as Exhibit A. Certain exhibits to Mr. Blok's report are attached as Exhibit B to the Selinger Decl.

The Peel Smart Remote application was not used in all the Accused Instrumentalities. The HTC One M7, One M8, and One M8 for Windows all used HTC's proprietary Sense TV application and Peel's interface object code. Salazar's technical expert, Mr. Griffin, failed to offer any opinion or analysis regarding the operations and functionality supplied by the Peel Smart Remote application. Both Sense TV and the Peel Smart Remote, however, included features (*e.g.*, a program guide) that are not covered by the '467 Patent.

6

report. The non-patented features available to Pronto|Peel users via the required Peel Smart Remote application include an electronic program guide or EPG, a channel list based on the user's cable provider and the ability to edit the list of available channels, and the ability to identify favorite programs and to set up notifications and reminders about favorite programs, among others. Selinger Decl. ¶¶ Ex. D at pp. 5-7, 12, 14, 23, 30 & 31 (excerpts from Pronto|Peel User Guide cited by Mr. Blok), Ex. E at p.3 (excerpt from Pronto|Peel get.pronto.com website cited by Mr. Blok), Ex. F at p.1 (Best Buy internet listing for Pronto|Peel device cited by Mr. Blok); Ex. G at pp. 1-2 (internet article regarding Proto cited by Mr. Blok); Ex. H at pp. 1-2 (internet article regarding Peel Proto cited by Mr. Blok).

Ignoring these non-patented features, Mr. Blok improperly utilizes a $15.00 retail price for the Peel Proto (*i.e.*, its entire market value) to estimate the alleged "value" of the "Accused IR Functionality." *See LaserDynamics*, 694 F.3d at 68. From that incorrect starting point, Mr. Blok then subtracts $1.00 in hardware costs to arrive at an estimated profit of $14.00 per unit that HTC Corp. allegedly enjoyed by adding the "Accused IR Functionality" to its multi-component and multi-featured Accused Instrumentalities.[3]

During his deposition, Mr. Blok confirmed that he did not apportion for any non-patented features of the Pronto|Peel, because, in his view, there were none to consider.

> [M]y analysis of value is based on a third-party add-on device called the Pronto. The Pronto is a basic -- it provides basic 2-way IR capabilities that according to Mr. Griffin are 100 percent attributable to -- or, you know, 100 percent of the elements are covered in the '467 patent.[4] But that Pronto, and what I am assessing as value -- you know, using to come up with the value of this functionality has nothing to do with Sense TV. *The **app**. [i.e., the Peel Smart Remote] that is used*

---

[3] Notably, Mr. Blok's $1.00 deduction is based on the estimated additional hardware component costs HTC Corp. incurs in connection with smartphones that include the "IR functionality." He does not identify, quantify, or even mention the actual hardware costs to the makers of the Pronto|Peel device or HTC's other hardware costs, which renders his "profit" analysis unsound. Nor does he consider any costs associated with the software (*i.e.*, the Peel Smart Remote application) required to implement the "IR Functionality" in the Pronto|Peel device or HTC's costs of the software necessary to implement the "Accused IR Functionality" in the Accused Instrumentalities.

[4] As discussed in Section III.D.1, below, Mr. Griffin did not offer any such opinion in his expert report. To the extent Mr. Blok seeks to offer or rely on opinions that purportedly are those of Mr. Griffin, but not included in Mr. Griffin's expert report, Mr. Blok should not be allowed to do so.

7

> *with the Pronto doesn't have a guide. It doesn't have all these additional functionalities that Mr. Bakewell is claiming should be apportioned out. It is a basic TV remote.*").

*See* Blok Depo. at 47:1-13. Based on the documents on which Mr. Blok relies, that premise is demonstrably false.[5]

In sum, Mr. Blok purports to limit his valuation of the "Accused IR Functionality" only to the invention claimed in the '467 Patent. *See* Blok Depo. 44:24-45:3; *see also id.* at 48:2-8; 49:10-20; 54:16-19; 59:16-20; 65:16-19; Blok Report, ¶17. Yet he erroneously utilizes the entire retail price of the Pronto|Peel device as a proxy for the value of just the "Accused IR Functionality" in the Accused Instrumentalities, despite the fact that the evidence on which he relies contradicts his assumptions about the Pronto|Peel device and exposes the fatal flaws in his methodology.[6] Mr. Blok fails to apportion the value of the patented (versus non-patented) features and functions provided by the required Peel Smart Remote application with which the Pronto|Peel device must be paired and, thus, fails to exclude the non-patented features from his calculations. The result is a failure to apply the required methodology, making his reasonable royalty opinions concerning the "Accused IR Functionality" unreliable and, therefore, inadmissible. *See VirnetX*, 767 F.3d at

---

[5] Excerpts from the transcript of Mr. Blok's January 24, 2018 deposition are attached to the Selinger Decl. as Exhibit C.

[6] Because his "value" assessment focused on only the Pronto|Peel (without the Peel Smart Remote application –which must be paired with the Pronto|Peel for the latter to function), Mr. Blok likewise ignored the relevance of non-patented features included in the Sense TV application, which implements, supports, and is required to operate the "Accused IR Functionality" on three of the four Accused Instrumentalities.

> Q. What is Sense TV?
> A. It is a -- I guess the marketing name that HTC gave *its app. that works with the two-way IR functionality*.
>
> \* \* \*
>
> My understanding is the Sense TV is – is an app. that is used by consumers that may provide a TV guide and -- and interfaces with the smart phone and -- and utilizes the two-way communication. But *I don't define, "[A]ccused IR functionality," as incorporating the Sense TV app.*
>
> \* \* \*
>
> Q. Well, have you looked at it to see whether or not Sense TV provides capabilities other than those specified in the '467 patent?
> A. I know it provides a TV guide, but it wasn't -- you know, *my analysis isn't based upon the Sense TV app., so I wasn't focused on features of the Sense TV app. in general.*

Blok Depo. 45:13-46:15 (emphasis added).

8

1328 (because the expert's underlying methodology was not sound, "the district court should have exercised its gatekeeping authority to ensure that only theories comporting with settled principles of apportionment were allowed to reach the jury.").

In *LaserDynamics*, the Federal Circuit explained the methodological failures of an approach similar to what Mr. Blok used here.

> Whether called "product value apportionment" or anything else, the fact remains that the royalty was expressly calculated as a percentage of the entire market value of a laptop computer rather than a patent-practicing ODD alone. This, by definition, is an application of the entire market value rule.
>
> LaserDynamics' use of the entire market value rule was impermissible, however, because LaserDynamics failed to present evidence showing that the patented disc discrimination method drove demand for the laptop computers. It is not enough to merely show that the disc discrimination method is viewed as valuable, important, or even essential to the use of the laptop computer. Nor is it enough to show that a laptop computer without an ODD practicing the disc discrimination method would be commercially unviable. Were this sufficient, a plethora of features of a laptop computer could be deemed to drive demand for the entire product. . . . We have consistently maintained that "a reasonable royalty analysis requires a court to hypothesize, not to speculate. . . . [T]he trial court must carefully tie proof of damages to the claimed invention's footprint in the market place." A damages theory must be based on "sound economic and factual predicates." The entire market value rule arose and evolved to limit the permissible scope of patentees' damages theories.

694 F.3d at 68 (citations omitted). The same logic applies to Mr. Blok's use of the entire value of the Pronto|Peel device (his chosen surrogate), without separating out the value of non-patented features included in the required Peel Smart Remote application. *See Ericsson*, 773 F.3d at 1226; *VirnetX, Inc.*, 767 F.3d at 1326.

On this basis alone, the Court should grant HTC Corp.'s motion and exclude Mr. Blok's proffered testimony regarding reasonable royalty damages. *Id.* at 1328 (sound methodology is a "critical prerequisite" to the admission of expert opinions on damages).

    **B.**    **Mr. Blok Failed To Support His Underlying Premise That The Pronto|Peel Device Is A Proper Proxy For The Value Of "IR Functionality" In The Accused Instrumentalities.**

Another flaw pervades Mr. Blok's opinions and independently warrants their exclusion.

9

Mr. Blok offers insufficient data (and no evidence) to support the assumption that the value of the Pronto|Peel device to its purchasers is equivalent to the value of the "Accused IR Functionality" in the Accused Instrumentalities.

As he must, Mr. Blok concedes that the Accused Instrumentalities have numerous components and features that do not implicate the '467 Patent.

> HTC incorporates a variety of technologies and features into its Accused Products, including the Accused IR Functionality as taught by the Patent-in-Suit. These technologies contribute to HTC's ability to generate the revenues and profits discussed above. Accordingly, *each of the technologies has a value that can be attributed to that particular feature or functionality*.

Blok Report, ¶ 67 (emphasis added); *id. at* ¶ 113. Therefore, Mr. Blok was required to determine the incremental value the "Accused IR Functionality" contributed to the Accused Instrumentalities as a whole. *See Finjan*, 2018 U.S. App. LEXIS 601 at \*\*24-27. This he did not do. Indeed, he performed no analysis of the incremental value of the "Accused IR Functionality" to the Accused Instrumentalities. Instead, he substituted his valuation of the Pronto|Peel device for the allegedly apportioned value of the "Accused IR Functionality" in the Accused Instrumentalities. *See* Blok Report ¶ 68 ("I relied upon third-party, add-on devices that encompass similar functionality ....").

Mr. Blok says he based his decision to focus his analysis on the Pronto|Peel device as the proxy for the "Accused IR Functionality" because of an "interview" with Mr. Griffin. *See* Blok Report ¶ 71 & n.183 ("Based on Mr. Griffin's review of information regarding the Pronto, he informed me that . . . [Pronto] is the next best alternative to the Accused IR Functionality."), Blok Report, ¶ 116 & n.253 ("Based on my interviews of Mr. Griffin, . . . the [Pronto] is the next best alternative to the Accused IR Functionality."). Here again, Mr. Blok improperly seeks to rely on purported opinions of Mr. Griffin that are not included in Mr. Griffin's expert report. *See* Section III.D.1, below.

At best, Mr. Blok's analysis does no more than assess the value of the "Accused IR Functionality" found *in the Pronto|Peel device* (which is not accused of infringing the '467 Patent),

10

although he fails to offer evidence that any Pronto|Peel devices actually were purchased by users for $15.00 or any other price. Blok Depo. 77:17-18 ("I haven't seen specific sales on the Pronto"). More importantly, his analysis measures only the estimated value of the Pronto|Peel device to some unknown percentage of smartphone users who may have decided to add IR functionality (together with other things included in the required Peel Smart Remote application) to their smartphones. Mr. Blok, however, provided no analysis or supporting data[7] for his necessary, but unsupported, assumption that the price paid by some hypothetical subset of smartphone users who purchased a Pronto|Peel device also represents a fair approximation of the incremental value that the "Accused IR Functionality" adds to the multi-featured and functioned smartphones accused of infringing in this case. Purchasers of the latter, of course, may base their purchasing decisions on any number of features, which is yet another reason why the Court should exclude Mr. Blok's proffered opinions and testimony. *See* Fed. R. Evid. 702(b) (among other things, expert opinion testimony must be "based on sufficient facts or data").

### C. Mr. Blok's 50-50 Profit Split Is Unreliable.

A third fatal flaw is Mr. Blok's conclusion that a reasonable royalty in this case would be $7.00 per infringing unit sold in the United States, which represents a 50-50 split (between HTC Corp. and Salazar) of the $14.00 per unit profit that Mr. Blok believes HTC Corp. enjoyed as a result of including "IR Functionality" in the Accused Instrumentalities. Blok Report, ¶ 123. Mr. Blok's assertion that the parties would split profits on a 50-50 basis is not the product of sound methodology. Instead, it is a thinly disguised use of profit-splitting theories, similar to the Nash bargaining solution that the Federal Circuit has rejected absent sufficient factual support and analysis, both of which are missing here. *See VirnetX*, 767 F.3d at 1332.

---

[7] During his deposition, Mr. Blok conceded that he did no analysis of, and had no information regarding actual sales of, or demand for, the Pronto|Peel or the percentage of smartphone users that purchased the Pronto|Peel. Nor did he conduct any research on these issues or consumer demand for the Accused IR Functionality. Blok Depo. at 67:10-68:15; 76:14-77:21. Salazar's counsel did not seek any such information from Peel, even during a deposition of Peel's 30(b)(6) representative.

Mr. Blok attempts to disguise his profit-splitting by presenting it as the logical result of the "hypothetical negotiation" within his consideration of the *Georgia-Pacific* factors. But, Mr. Blok's analysis does not meet the Federal Circuit's standards for permitting profit splitting opinions. In *VirnetX*, the Federal Circuit agreed "with the courts that have rejected invocations of the Nash theorem without sufficiently establishing that the premises of the theorem actually apply to the facts of the case at hand." While the Court did not reject the application of the Nash bargaining solution in all cases, it rejected the expert's applications of the theorem as insufficiently tied to the facts of that case.

> The Nash theorem arrives at a result that follows from a certain set of premises. It itself asserts nothing about what situations in the real world fit those premises. Anyone seeking to invoke the theorem as applicable to a particular situation must establish that fit, because the 50/50 profit-split result is proven by the theorem only on those premises. Weinstein did not do so. This was an essential failing in invoking the Solution.

*Id.* As the Federal Circuit recognized, the Nash bargaining solution, when properly applied, "focuses only on the incremental profits earned by the infringer from the use of the asserted patents." *Id at* 1333-34. As shown above, Mr. Blok failed in that exercise. Moreover, Mr. Blok's conclusion that the end result of the hypothetical negotiation between Salazar and HTC Corp. would be a 50-50 profit split is not sufficiently tied to the facts of this case.

### D. Other Opinions And Testimony The Court Should Exclude

#### 1. The Court should exclude opinions and testimony taken from interviews with Mr. Griffin that are not in Mr. Griffin's expert report.

Several opinions in Mr. Blok's report appear to be based solely on opinions purportedly offered by Salazar's technical expert, Mr. Griffin, during conversations with Mr. Blok, but are not opinions disclosed anywhere in Mr. Griffin's expert report. Allowing Mr. Blok to offer Mr. Griffin's undisclosed opinions is an improper end-run around the rule against allowing experts to testify beyond the scope of their expert reports. The specific opinions (of Mr. Griffin) that Mr. Blok apparently intends to discuss at trial include the following:

12

- Blok Report ¶ 14 & n.41 – "According to Mr. Griffin, the teachings of the '467 Patent represented a 'significant improvement' over the prior art."

- Blok Report ¶ 71 & n.183 – "Based on Mr. Griffin's review of information regarding the Pronto, he informed me that . . . [Pronto] is the next best alternative to the Accused IR Functionality."

- Blok Report ¶ 103 & n. 246 – "According to Mr. Griffin, 100% of the benefits provided by the Accused IR Functionality are attributable to the teachings of the Patent-in-Suit . . . ."

- Blok Report, ¶ 116 & n.253 – "Based on my interviews of Mr. Griffin, . . . the [Pronto] is the next best alternative to the Accused IR Functionality."

- Blok Report ¶ 107 (3d bullet point) – "The teachings of the Patent-in-Suit represent substantial improvements and provide substantial benefits over prior methods." *See* Blok Report ¶ 14, relying on Griffin interview for a substantially similar opinion.

- Blok Report ¶ 107 (6th bullet point) - 100% of the economic value of the Accused IR Functionality is attributable to the teachings of the Patent-in-Suit." *See* Blok Report, ¶ 103, relying on Griffin interview for a substantially similar opinion.

- Blok ¶ 120 - "As noted above, according to Mr. Griffin, 100% of the Accused IR Functionality is attributable to the Patent-in-Suit."

None of these opinions are included in Mr. Griffin's report. Nor does Mr. Blok identify the specific bases on which Mr. Griffin relied in purportedly reaching these opinions. Neither Mr. Blok nor Mr. Griffin should not be allowed to offer these opinions at trial.

2. <u>Mr. Blok's irrelevant opinions and testimony that would taint the jury should be excluded.</u>

Finally, Mr. Blok includes in his report opinions disclosing (a) his calculations regarding the prices of the Accused Instrumentalities; (b) his calculations of the total (gross) revenue HTC Corp. allegedly received from sales of the accused smartphones; and (c) other financial data concerning costs of goods, margins, and the like with respect to the Accused Instrumentalities as a whole. See Blok Report ¶¶ 64, 92, 124, 125 & Blok Report Exhibits 5-8. These opinions (and the underlying facts on which they are purportedly based) are clearly inadmissible in this case.[8]

---

[8] In his report, Mr. Blok does not opine on or even refer to his Exhibits 5, 6, or 8.

13

Mr. Blok opines that Salazar is entitled to a reasonable royalty of $7.00 per infringing unit sold in the United States. His calculations are in no way dependent on HTC Corp.'s gross or net revenues on such sales. He also concedes that the entire market value of the Accused Instrumentalities (as opposed to the Pronto|Peel device), is not an appropriate consideration in this case. *See* Blok Report, ¶ 101. Under these circumstances, the Court should not allow Mr. Blok to present opinions or testimony that disclose or relate to the entire market value of the Accused Instrumentalities. As the Federal Circuit explained in *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1320 (Fed. Cir. 2011), disclosure of overall product revenues "cannot help but skew the damages horizon for the jury, regardless of the contribution of the patented component to this revenue." *Id*. at 1320 (noting that "the $19 billion cat was never put back into the bag" and that neither cross-examination nor a curative jury instruction could have offset the resulting unfair prejudice). *See also LaserDynamics*, 694 F.3d at 68 ("Admission of such overall revenues, which have no demonstrated correlation to the value of the patented feature alone, only serve to make a patentee's proffered damages amount appear modest by comparison, and to artificially inflate the jury's damages calculation beyond that which is 'adequate to compensate for the infringement.'") (*citing Uniloc* and 35 U.S.C. § 284). Accordingly the Court should exclude any opinions and testimony by Mr. Blok (and any Exhibits to his report) that refer to the total revenues HTC Corp. allegedly derived from the sale of Accused Instrumentalities, the prices of Accused Instrumentalities, and any other financial information relating to costs, profit margins, and the like with respect to the whole of the Accused Instrumentalities.

### IV. CONCLUSON

For the foregoing reasons, the Court should grant HTC Corporation's motion.

Dated: February 19, 2018

Respectfully submitted by,

*/s/ Jerry R. Selinger*
Jerry R. Selinger
State Bar No. 18008250
Email: jselinger@pattersonsheridan.com
Trampas A. Kurth
State Bar No. 24055807
Email: tkurth@pattersonsheridan.com
PATTERSON + SHERIDAN, LLP
1700 Pacific Avenue, Suite 2650
Dallas, Texas 75201
Tel: 214.272.0957
Fax: 713.623.4846

*/s/ Fred I. Williams*
Fred I. Williams
TX Bar No. 00794855
Email: fwilliams@velaw.com
Mario A. Apreotesi
TX Bar No. 24080772
Email: mapreotesi@velaw.com
VINSON & ELKINS LLP
2801 Via Fortuna, Suite 100
Austin, Texas 78746
Tel: 512.542.8400
Fax: 512.542.8612

Todd E. Landis
TX Bar No. 24030226
Email: tlandis@velaw.com
VINSON & ELKINS LLP
2001 Ross Avenue, Suite 3700
Dallas, Texas  75201
Tel:  210.220.7700
Fax: 210.220.7716

Harry Lee Gillam, Jr.
State Bar No. 07921800
Email: gil@gillamsmithlaw.com
GILLAM & SMITH, LLP
303 South Washington Avenue
Marshall, Texas   75670
Tel: 903.934.8450
Fax: 903.934.9257

ATTORNEYS FOR DEFENDANT
HTC CORPORATION

**CERTIFICATE OF SERVICE**

      I certify that on February 19, 2018 a true and correct copy of the foregoing document was electronically filed with the clerk of the court for the U.S. District Court, Eastern District of Texas, using the electronic case filing ("ECF") system of the court.  The attorneys of record who have consented in writing to accept notice as service of this document by electronic means are being served by a "Notice of Electronic Filing," sent by the ECF system.

*/s/ Fred I. Williams*
Fred I. Williams

**CERTIFICATE OF CONFERENCE**

      I certify that on February 19, 2018, HTC Corporation's counsel conferred by telephone with Plaintiff's counsel, Andy Tindel, about whether Plaintiff opposed this motion.  Mr. Tindel stated that Plaintiff opposed the motion.

*/s/ Fred I. Williams*
Fred I. Williams