IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | |
|---|---|
| JOE ANDREW SALAZAR, § | |
| § | |
| Plaintiff, § | |
| § | |
| v. § | No. 2:16-CV-01096-JRG-RSP |
| § | |
| HTC CORPORATION, § | |
| § | |
| Defendant. § | |

## REPORT AND RECOMMENDATION

In this patent case, the Court now considers Defendant HTC Corporation's Motion for Summary Judgment of Noninfringement [Dkt. # 149]. For the reasons explained below, the motion should be **GRANTED IN PART**.

### I. BACKGROUND

Plaintiff Joe Salazar accuses HTC Corporation of infringing Claim 1 and Claim 34 U.S. Patent 5,802,467 by making and selling smartphones. More specifically, Salazar alleges three HTC smartphone models—the One M7, One M8, and One M9—literally embody the asserted claims of the '467 Patent. Second Am. Compl. [Dkt. # 44] ¶ 7. Salazar also claims indirect and willful infringement, and that at least some claims limitations, if not literally satisfied, are satisfied under the doctrine of equivalents. *Id.* ¶ 15, 17, 23

The '467 Patent, which is now expired, relates to a system for two-way communication with appliances, such as intercoms, televisions, sound systems, and the like. *See, e.g.*, '467 Patent fig.1b. According to the patent, prior-art devices communicated with such

appliances only using one-way communication, and usually with only one of an infrared (IR) frequency signal or a radio frequency (RF) signal. *Id.* at 1:18–50. Relative to the prior art, the '467 Patent considered full two-way communication directly with an appliance using IR or RF links to be significantly advantageous. *Id.* at 1:51–2:11.

Generally, Defendant moves for summary judgment of noninfringement on five grounds. First, Defendant contends, for a number of different reasons, that the accused devices do not satisfy the all-elements rule as to the asserted claims. Second, Defendant claims Salazar has no evidence supporting his willful infringement, indirect infringement, or doctrine-of-equivalents positions. Third, Defendant contends Salazar has no evidence to show the asserted claims cover the One M9. Fourth, Defendant claims summary judgment is appropriate for accused devices sold to Sprint by Defendant's subsidiary, HTC America, because Defendant has not, within the United States, committed acts prohibited by 35 U.S.C. § 271 with respect to those devices. Finally, Defendant urges the Court to grant summary judgment as to certain patent claims that Salazar has agreed to dismiss.

## II. APPLICABLE LAW

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). The substan-

tive law identifies the material facts, and disputes over facts that are irrelevant or unnecessary will not defeat a motion for summary judgment. *Id.* at 248. A dispute about a material fact is "genuine" when the evidence is "such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In considering motions for summary judgment, the Court must draw all reasonable inferences in favor of the non-moving party. *Id.* at 255; *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398 (5th Cir. 2008).

## III. DISCUSSION

### A. The all-elements rule.

#### 1. The meaning of "configured to"

Defendant's first argument concerns "a memory device coupled to [a] microprocessor *configured to* store a plurality of parameter sets." '467 Patent 26:1–2 (emphasis added); *see also id.* at 30:15–16. Citing testimony of Roy Griffin, Salazar's infringement expert, Defendant contends Salazar has evidence the accused devices are *capable of* being so configured, which is insufficient to meet the limitation. Def.'s Mot. [Dkt. # 149] at 10. According to Defendant, the claims require *actual* configuration, which does not happen until a user connects the phones to third-party servers and downloads command codes[1] for a particular external device. *Id.* at 10–11. Salazar, however, claims Defendant misrepresents Griffin's position, Pl.'s Resp. [Dkt. # 177] at 4, and that Griffin testified that user activity is not required to meet the claim limitation, *id.* at 5.

---

[1] Command codes are codes representative of signals used to remotely control a particular device. *See* '467 Patent at 7:34–54.

The Court disagrees with Salazar's characterization of Griffin's testimony. Griffin clearly testifies that "configured to" means "capable of," which is the basis for his opinion that user activity is not required—as opposed to the devices having undergone some configuration process before downloading the command codes. Griffin Dep. (Jan. 23, 2018) [Dkt. # 177-5] at 157:19–158:4; *id.* at 162:21–23; *id.* at 163:13–17. Clearly, then, there is a fundamental dispute between the parties about the meaning of "configured to"—i.e., does "configured to" require more than mere capability—which the Court must resolve. *See O2 Micro Int'l v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008) ("When the parties present a fundamental dispute regarding the scope of a claim term, it is the court's duty to resolve it.").

"[T]he best source for understanding a technical term is the specification from which it arose." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005); *see also Moba, B.V. v. Diamond Automation, Inc.,* 325 F.3d 1306, 1315 (Fed. Cir. 2003) ("[T]he best indicator of claim meaning is its usage in context as understood by one of skill in the art at the time of invention."). Here, the specification refers to configuring memory "so as to store a finite set of parameters" to "take substantially less memory space than if the entire signal were to be stored." '467 Patent at 8:22–30. More specifically, the patent contemplates storing some parameters in one array and other parameters in other arrays, thus suggesting some particular arrangement of the parameters as arrayed within memory. *Id.* at 8:31–65; *see also id.* fig.6 (illustrating the specific fields in each array). Thus, the specification suggests a conclusion that Defendant's construction is more proper.

Also, the specification's use of "configured to" is consistent with dictionary definitions for the term. *See Phillips*, 415 F.3d at 1322–23 (noting judges may rely on a dictionary so long as the definition does not contradict any definition ascertained by reading the patent documents) (citing *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1585 (Fed. Cir. 1996). One dictionary defines "configure" as "to set something up, arrange something in a particular way, or fix something up for a particular purpose." http://www.yourdictionary.com/configure (last visited Apr. 27, 2018). That same dictionary defines "capable" as "permitting an action to be performed." http://www.yourdictionary.com/capable (last visited Apr. 27, 2018).

Based on the patent's usage of "configured to" and these dictionary definitions, the Court construes "configured to" to require some particularized arrangement of the memory device for a specific purpose. The Court therefore rejects Salazar's position that a mere capability of storing, or capability of being configured to store, is sufficient.

Defendant's undisputed facts, however, don't address the "memory device" configuration. Rather, they address whether the accused devices can be used prior to downloading parameter sets or command codes, *see* Def.'s Mot. [Dkt. # 149] at 4 (¶¶ 12–13), despite that the "configured to" language does not require the presence of such parameter sets or command codes. As such, Defendant has not sufficiently shown the Court the memory device could not be "configured to store" without actually storing—i.e., before the downloading. The Court therefore concludes Defendant has failed to show it is entitled to summary judgment as a matter of law, and this part of the motion should be **denied**.

### 2. *The infrared transceiver*

The asserted claims require an "infra-red frequency transceiver coupled to [a] microprocessor for transmitting to said external devices and receiving from said external devices." '467 Patent at 26:13–17; *see also id.* at 30:27–31. Defendant contends this requires that the IR transceiver of an accused device be capable of transmitting to at least two separate external devices and receiving from the *same* devices. Because Salazar has no evidence that the accused devices have this capability, says Defendant, summary judgment is proper. *See generally* Def.'s Mot. [Dkt. # 149] at 11–13.

Salazar responds that Defendant wrongly assumes each external device must be capable of transmitting and receiving IR signals, and that each external device must have both transmitted and received IR signals. This, says Salazar, goes against the plain and ordinary meaning of the phrase. According to Salazar, the claim only requires that the IR transceiver be capable of sending and receiving IR signals in accordance with the communication protocols. *See generally* Pl.'s Resp. [Dkt. # 177] at 7–9.

Here, too, the parties present a claim-construction dispute for the Court to resolve. Effectively, Defendant urges the Court to construe "said external devices" in the microprocessor limitation as "*each* external device of the plurality of external devices." Salazar, on the other hand, interprets "said external devices" as shorthand for the earlier recited "plurality of external devices"—*i.e.*, a single group made up of external devices.

The Court agrees with Salazar. The limitation only requires that the IR transceiver be capable of sending and receiving IR signals to the plurality of external devices—*not* that

it be capable of transmitting and sending to each device within that plurality. The specification supports this conclusion by noting "the signals can be transmitted *and/or* received . . . to any number of appliances and/or apparatus capable of receiving *and/or* transmitting compatible signals." '467 Patent at 2:17–20 (emphasis added). Thus, Defendant's position is too narrow and, because the remainder of Defendant's argument is based on that construction, this part of the motion should be **denied**.

### 3. Communication *"in accordance with said communication protocols"*

Each asserted claim requires the IR transceiver to transmit and receive "in accordance with [earlier-recited] communications protocols." '467 Patent at 26:16–17; *see also id.* at 30:30–31. Defendant contends this language requires the IR transceiver to communicate in accordance with each and every protocol usable by the device, regardless of whether each protocol is designed for IR communication. For example, HTC contends that, because Griffin identifies Bluetooth and NFC as RF communications protocols that can be used by the accused devices, and because those are RF protocols (rather than IR protocols), this claim limitation is not met because the transceiver cannot use them. *See generally* Def.'s Mot. [Dkt. # 149] at 13–15.

Salazar counters that a person of ordinary skill would understand that the IR transceiver can send and receive in accordance with IR communication protocols and an RF transceiver can send and receive in accordance with RF communication protocols. *See generally* Pl.'s Resp. [Dkt. # 177] at 7–8. Moreover, says Salazar, the asserted claims do not require any external devices be capable of transmitting or receiving IR or RF. *Id.* at 8–9.

The Court agrees with Salazar. The point of the invention is to enable communication with many different types of external devices, which between them may implement different IR and/or RF communication protocols. Considering the claim language in that context, it's nonsensical to require the RF transceiver to communicate using IR communications protocols, or to require the IR transceiver to communicate using RF protocols. Thus, because the Court rejects Defendant's interpretation of the term, this part of the motion should be **denied**.

    4.  *The meaning of "creating" or "generating" a communication protocol*

Each of the asserted claims recites "a microprocessor . . . creating a plurality of reprogrammable communications protocols." '467 Patent at 25:60–63; *see also id.* at 30:8–11. Defendant contends this language requires a microprocessor that "creates" new communication rules for communicating with external devices—i.e., that the microprocessor brings new protocols into existence. Because the protocols at issue are created by third parties, says Defendant, the accused devices do not meet this limitation. *See generally* Def.'s Mot. [Dkt. # 149] at 17–19. Salazar responds that a person of ordinary skill would not understand "creating," as used by the patent, to mean bringing a new protocol into existence. *See generally* Pl.'s Resp. [Dkt. # 177] at 9–10.

The Court again agrees with Salazar. In describing the microprocessor, the specification notes one embodiment is "configured to utilize several communication protocols employed by various manufacturers or various models of the same brand." '467 Patent at

7:37–39. But nowhere does the specification teach the creation of new "rules" for communicating, which would defeat the purpose of the invention—to facilitate communication with different third-party external devices. Accordingly, the Court rejects Defendant's interpretation of this limitation, and this part of the motion should be **denied**.

> 5. *Whether the accused "microprocessor" carries out each and every claim limitation*

Defendant argues the accused devices' Snapdragon 600 microprocessor, which Salazar claims satisfies the "microprocessor" limitation of the asserted claims, does not "recreate a desired command code set." Defendant's argument relies on Griffin's testimony that a "command code set" is a "set of signals that are the after-modulated signal." Because a different microcontroller (the MAXQ614) generates and modulates the IR carrier waveform with the command data, Defendant contends this claim limitation is not satisfied by the accused devices. *See generally* Def.'s Mot. [Dkt. # 149] at 17–19.

Salazar responds that microprocessors often utilize coupled components to perform operations under their control. Here, says Salazar, the microprocessor limitation is satisfied even if a peripheral component is used to carry out a function under the command of the microprocessor. Pl.'s Resp. [Dkt. # 177] at 10–12.

Despite Griffin's testimony, the patent establishes that the "command code set" is stored data rather than a transmitted signal. Claim 1 for example, recites "that the memory space required to store said parameters is smaller than *the memory space required to store said command code sets*." '467 Patent at 26:4–6. Claim 34, in fact, distinguishes between the command code set and the resultant pulse signals generated based on the command

code set. *Id.* at 30:15–20 (reciting "a memory device . . . configured to store a plurality of parameter sets retrieved by said microprocessor so as to recreate based on said parameter sets a desired set of pulse signals . . . as specified by a command code set"); *see also id.* at 7:55–60 ("It will be appreciated that a handset that is capable of communicating with substantially all major brands of various devices . . . requires a substantially large memory to store all the command code sets with various sets of signals."). Thus, that the MAXQ614 might actually modulate a signal based on a command code set is immaterial to whether the Snapdragon 600 recreates command code sets in the memory device. This part of the motion should therefore be **denied**.

### B. Indirect Infringement, Willful Infringement, and the Doctrine of Equivalents.

#### 1. *Indirect infringement and willful Infringement*

Defendant asserts Salazar cannot prove the "knowledge" element of indirect infringement or the "culpable behavior" element of willful infringement because Defendant did not have notice of the '467 Patent before it expired. *See generally* Def.'s Mot. [Dkt. # 149] at 19–21. Salazar concedes he has no evidence to support these claims. Pl.'s Resp. [Dkt. # 177] at 15. Accordingly, summary judgment should be **granted** with respect to these two claims.

#### 2. *The doctrine of equivalents.*

Defendant argues the Court should grant summary judgment concerning the doctrine of equivalents because Salazar's infringement expert, Roy Griffin, offers no particularized testimony that creates a fact issue as to equivalents. *See generally* Def.'s Mot. [Dkt.

# 149] at 21. Salazar notes Griffin's opinion that, if the identified elements are not literally met, the components perform substantially the same function, in substantially the same way, to obtain the same result. *See generally* Pl.'s Resp. [Dkt. # 177] at 15.

> In the context of summary judgment,
>
> > a patentee must . . . *provide particularized testimony and linking argument* as to the 'insubstantiality of the differences' between the claimed invention and the accused device or process, or with respect to the function, way, result test when such evidence is presented to support a finding of infringement under the doctrine of equivalents. *Such evidence must be presented on a limitation-by-limitation basis.* Generalized testimony as to the overall similarity between the claims and the accused infringer's product or process will not suffice.

*AquaTex Indus., Inc. v. Techniche Solutions*, 479 F.3d 1320, 1328 (Fed. Cir. 2007) (quoting *Tex. Instruments, Inc. v. Cypress Semiconductor Corp.*, 90 F.3d 1558, 1567) (Fed. Cir. 1996) (emphasis in original); *see also Texas Instruments Inc. v. Cypress Semiconductor Corp.*, 90 F.3d 1558, 1567–68 (Fed. Cir. 1996) (rejecting as insufficient (1) generalized expert testimony as to overall similarity, and (2) expert testimony lacking discussion of whether or how the *way* the accused device met the claim limitation under the doctrine and *why* the function and result were the same); *Lear Siegler, Inc. v. Sealy Mattress Co. of Mich., Inc.*, 873 F.2d 1422, 1427 (Fed. Cir. 1989) (noting general references to the doctrine of equivalents do not provide the necessary "explicit exposition" of all three *Graver Tank* elements because a jury cannot be expected to determine infringement under the doctrine without evidence and argument concerning the doctrine and each of its elements). Thus, "[t]he evidence and argument on the doctrine of equivalents cannot merely be subsumed in [a] plaintiff's case of literal infringement." *Lear Siegler*, 873 F.2d at 1425.

Here, Salazar relies on nothing more than Griffin's boilerplate references to the doctrine of equivalents in his report. Griffin, however, provides no specific analysis concerning how the doctrine applies to even a single limitation of the asserted claims. Accordingly, the Court concludes Salazar cannot meet the Federal Circuit's evidentiary burden for doctrine-of-equivalents contentions, and summary judgment should be **granted** as to this part of the motion.

### C. The One M9

The accused devices require software applications to implement the accused IR technology. For that purpose, the One M7 and One M8 include a preloaded version of HTC's "Sense TV" application. The One M9 includes the Peel Smart Remote application supplied by a third-party.

Defendant argues it is entitled to summary judgment of noninfringement for all claims concerning the One M9 because Griffin's infringement analysis and opinions do not mention the Peel Smart Remote application. Def.'s Mot. [Dkt. # 149] at 22–23. Salazar responds that Griffin's report identifies all of the exemplary components and source code in the One M8 and concluded the One M9 has substantially the same components as the HTC One M7 and M8. Pl.'s Resp. [Dkt. # 177] at 12–13.

Griffin's report only mentions the Peel Smart Remote application only when describing operation of the Pronto, an "IR blaster" used as a proxy for damages calculations by Salazar's damages expert. *See, e.g.*, Griffin Rep. [Dkt. # 177-2] at 13–14 (¶ 50). Griffin's infringement chart, which provides his substantive analysis, does *not* refer to the Peel Smart Remote application, nor do Salazar's infringement contentions. *See* Claim Chart A

[Dkt. # 177-9]; Pl.'s Discl. of Asserted Claims & Infringement Contentions [Dkt. # 116-2]. Moreover, Griffin's report makes no mention of the Sense TV application being an exemplary component or providing exemplary source code.

Clearly, the software is important to Griffin's infringement analysis. Griffin, for example, supports his finding of certain claim limitations with references to the Sense TV application. *See, e.g.*, Griffin Rep. Ex. C [Dkt. # 177-9] at 4 ("Each of these profiles necessarily includes a plurality of parameter sets so that when a particular button in the Sense TV application is pressed for a particular external device, the proper corresponding parameter set is utilized for IR transmission"), 7 ("the Sense TV Application configures the microprocessor to store a plurality of parameter sets in a memory coupled to the microprocessor"). But Griffin does not clearly conclude the Sense TV by itself satisfies a particular claim limitation. Thus, it is not evident that Salazar cannot prove his claims for the One M9 without reference to the Peel Smart Remote application. As such, this part of the motion should be **denied**.

### D. The Accused Devices Retailed by Sprint

Defendant contends, and Salazar does not dispute, that (1) it manufactures the accused devices in Taiwan, Def.'s Mot. [Dkt. # 149] at 2 (¶ 2); (2) effective June 1, 2010, HTC America, Inc. became Defendant's United States distributor and the importer of record for the accused devices, *id.* at 6 (¶ 23); (3) title to all HTC-branded smartphones passes to HTC America outside of the United States, *id.*; and (4) after June 1, 2010, United States sales of the accused devices to Sprint were made by HTC America, *id.* (¶ 24). Accordingly, Defendant contends summary judgment is proper for all accused devices ultimately sold to

Sprint because those sales were by HTC America, whereas Defendant's acts were outside the scope of 35 U.S.C. § 271.

Although Salazar's response relies only legal argument, his surreply cites to (1) a "Master Purchase Agreement" between Defendant and Sprint dated January 2, 2010 [Dkt. # 208-2], and (2) a June 1, 2010, "Amendment No. 6" to the Master Purchase Agreement [Dkt. # 208-2] between Defendant, Sprint, and HTC America. Salazar contends the Amendment assigned Defendant's accounting and distribution duties, but that Defendant retained ownership of its software and intellectual property, which is sufficient to establish a "sale" within the United States for purposes of 35 U.S.C. § 271. *See generally* Def.'s Resp. [Dkt. # 177] at 13–15; Def.'s Surreply [Dkt. # 208] at 9–10.

In light of these two documents, summary judgment is not proper because there is a fact issue as to whether Defendant "sold" the accused devices to Sprint within the meaning of § 271. The Master Purchase Agreement obligates Defendant to deliver the accused products to Sprint's designated warehouses within the United States. Master Purchase Agreement [Dkt. # 208-2] at 20 (¶ 8.1); *see also id.* at Ex. L. The Amendment purports to assign the right to receive and process purchase orders, issue purchases orders, and receive payments, but does not delegate the obligation to ship accused devices to Sprint. Amendment [Dkt. # 208-2] at 2. Moreover, even after the Amendment, Defendant remained liable for any and all breaches of the agreement by HTC America. *Id.* Thus, a reasonable jury could infer that Defendant had obligations of performance that would constitute a "sale" within the meaning of § 271. *See, e.g.*, *N. Am. Philips Corp. v. Am. Vending Sales, Inc.*, 35 F.3d 1576, 1579 (Fed. Cir. 1994) (noting the place of performance may control over the place

where legal title passes for the purpose of determining the location of the allegedly infringing sale). Accordingly, this part of Defendant's motion should be **denied**.

### E. Claim 10 and Its Dependents

Finally, Defendant moves for summary judgment of noninfringement as to Claim 10 and its dependent claims based on Salazar's stipulation to no longer assert those claims. Def.'s Mot. [Dkt. # 149] at 24. The Court, however, has already dismissed those claims with prejudice. *See* Order of Dismissal With Prejudice [Dkt. # 153]. Accordingly, this part of Defendant's motion should be **denied as moot**.

## IV. ORDER

The Court **ADOPTS** the constructions set forth in this opinion for the disputed terms of the patent-in-suit. *See* Part III.A *supra*. The Court **ORDERS** the parties not to refer, directly or indirectly, to each other's claim construction positions in the presence of the jury. Likewise, the Court **ORDERS** the parties to refrain from mentioning any portion of this opinion, other than the actual constructions adopted by the Court, in the presence of the jury. Any reference to claim construction is limited to informing the jury of the definitions adopted by the Court.

## V. RECOMMENDATIONS

For the reasons set forth above, summary judgment should be **GRANTED** for Defendant with respect to Salazar's indirect infringement, willfulness, and doctrine-of-equivalents claims. Otherwise, Defendant's motion should be **DENIED**.

A party's failure to file timely written objections to the findings, conclusions, and recommendations contained in this report after being served with a copy bars that party

from *de novo* review by the district judge of those findings, conclusions, and recommendations and, except on grounds of plain error, from appellate review of unobjected-to factual findings, and legal conclusions accepted and adopted by the district court. Fed. R. Civ. P. 72(b)(2); *see Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996) (*en banc*).

**SIGNED this 1st day of May, 2018.**

_____
ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE